FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
JUL 09 2021
TAMMY H. DOWNS, CLERK
By: _____ DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

ARRON MICHAEL LEWIS
ADC #151373                                PLAINTIFF

V.                 No. 5:18-CV-218-BRW-JTR

WENDY KELLEY, Director
Arkansas Department of Correction, *et al.*              DEFENDANTS

## ORDER

Plaintiff Arron Michael Lewis ("Lewis") alleges that on June 9, 2016, "at approximately 10:30 a.m.," Defendant Hazel Robinson ("Robinson") used excessive force against him, while he was in handcuffs and shackled, and being escorted to see a medical provider in the Varner Supermax Unit ("VSM"). According to Lewis, "Corporal Sanders," the other escort guard, witnessed Robinson's use of excessive force. Lewis alleged these facts in what he designated as an "Emergency Grievance," which he dated and signed on June 10, 2016. *Doc. 56 at 3–6*.

Sergeant Jackson received the "Emergency Grievance" on June 14, 2016. Sergeant Jackson, who is identified as "the problem solver," appears to have decided that the nature of Lewis's complaint did not qualify to be handled as an "Emergency Grievance" and he chose to treat Lewis's submission as a Step 1 "informal resolution." *Id. at 3*. Sergeant Jackson also appears to have talked to Robinson about Lewis's excessive force complaint because she wrote the following nonsensical

response on the informal resolution: "I did not hit any [sic] and witness to no one hitting [sic] any inmates." She then signed and dated her statement "June 14, 2016." *Id.*

Lewis's Step Two grievance was denied on October 9, 2016.[1] *Doc. 56 at 4*. Although the signature on the response to the grievance is illegible, it appears that the "decision maker" was Warden Randall Watson,[2] who stated the following reasons for denying it

> Cpl. Sanders . . . did not witness Sgt. Robinson strike you. Sgt. Robinson advises that at no time did she strike you with a closed fist . . . . According to security logs . . . you . . . were escorted out of cell #321 at 10:50 a.m., not 10:30 a.m. Due to the date and time frame you alleged video footage could not be obtained for viewing to support you [sic] allege [ sic] allegation. Therefore, I find this issue without merit.

From this response, it appears that Warden Watson may have talked to another unnamed individual about why there was no preserved video of the incident. This unnamed individual appears to have investigated the matter and determined that,

---

[1] Under ADC regulations, a Step Two grievance is supposed to be decided within "20 working days of receipt (or less if an emergency situation)." ADC Administrative Directive 14-16 § IV(F)(7) (*Doc. 15-1 at 10)*. And "the *entire* [three-step] grievance procedure should be completed within seventy-six (76) working days." AD 14-16 § IV(G)(9) (*Doc. 15-1 at 13*) (emphasis added). To date, no explanation has been provided for the *long delay*, of over 90 days, in ruling on Lewis's Step Two grievance.

[2] According to Director Dexter Payne's Step Three Decision affirming the denial of Lewis's grievance, the Step Two decision maker was the Warden of VSM. *Doc. 56 at 4*. In October of 2016, the VSM Warden was Randall Watson. *See* Supplemental Declaration of Randall Watson, *Williams v. York*, No. 5:14-CV-281 (E.D. Ark. Nov. 15, 2016) (ECF No. 135-1) ("I [Randall Watson] have been employed by the Arkansas Department of Correction as Warden of the Varner Unit during the time period that includes July 2013 to present [November 15, 2016].")

2

back in June of 2016, someone else attempted to locate and preserve the video, *using only Lewis's approximate time for the incident of "10:30 a.m."* Warden Watson's cryptic response seems to indicate that, when the individual who initially searched for the recording of the incident did not see anything taking place at "10:30 a.m.," she or he concluded *no video needed to be preserved* because there was "no evidence" on the video at "10:30 a.m." to support Lewis's claim that Sgt. Robinson hit him with her fist. *Doc. 56 at 4*. Finally, Warden Watson concludes that *it is Lewis's own fault* that the video could not be located and preserved because: "Due to the date and time frame you alleged video footage could not be obtained…." The irony of this conclusion will become clear later.

What is striking about Warden Watson's response is that the individual who was conducting the investigation into the missing video, in October of 2016, used the relevant VSM *security log* to determine that the *correct time* of the incident was "*10:50 a.m.*," not the "approximate" time of 10:30 a.m. that Lewis provided in his June 10, 2016 "Emergency Grievance." This same *security log* also was available in June of 2016, and could have and should have been consulted by the individual *who initially was responsible for locating and preserving the video of this incident*. Why did this individual use only Lewis's "approximate" time of the incident to locate the video? Why would anyone commit such a blunder when they knew the precise time of the incident would be recorded in the security log? When this individual saw

3

*nothing* on the video at the "approximate" time of 10:30 a.m., why did she or he jump to the startlingly illogical conclusion that it must mean there was "no evidence" the incident occurred? How could anyone who found "nothing" on the video, using what she or he *knew* was an "approximate" time of the incident, not recognize that the security log needed to be reviewed to determine the *precise time* the incident took place? All of these as yet unanswered questions are so troubling and so important because the individual conducting this initial search: (1) *knew* that failing to locate and preserve the video of the incident would result in it being overwritten and destroyed within the next 30 days, in accordance with ADC regulations; and (2) the way she or he went about trying to locate and preserve the incident *violated every step* governing how a video of such an incident was supposed to be located and preserved, as spelled out in ADC Administrative Directive 14-04 ("AD 14-04"). In light of these indisputable facts, the explanation given by Warden Watson in his response is disingenuous at best.

VSM houses some of the most dangerous and incorrigible prisoners in the ADC. In my many years on the bench, I cannot recall a single excessive force case involving a VSM inmate in which the video of the incident was *not* preserved. Furthermore, in my experience, the guards and officers at VSM are among the most experienced and best trained employees in the ADC. This raises even more questions about how and why the video of this incident was not located and preserved.

4

On May 24, 2021, Lewis filed a Motion to Compel Defendants to allow him to review AD 14-04, and take notes on its content. *Doc. 87.* Defendants vigorously opposed the motion on the ground that AD 14-04 contained "highly confidential information. . . [about the preservation of recordings of video incidents which] would pose a security threat" if an inmate were allowed to see it. *Doc. 91 at 2.*

In Lewis's Reply, he clarified that he was requesting that Defendants be compelled to file AD 14-04 with the Court, under seal, so it could review and determine the relevance of that document. *Doc. 93*. Lewis argued that AD 14-04 would prove that Defendants deliberately and intentionally did not follow the specified steps for locating and preserving the video to insure it would later be overwritten and destroyed.

On June 3, 2021, I entered an Order compelling Defendants to file a copy of AD 14-04, under seal, so I could determine if the document contained: (1) "highly confidential information" that "would pose a security threat" if released; and (2) evidence supporting Lewis's position that Defendants willfully and deliberately ignored AD 14-04 to avoid preserving the video of the excessive force incident.

On June 16, 2021, Lewis filed a Motion for Sanctions based on Defendants' willful and intentional destruction of the video. *Doc. 100*. He argued the Court should impose as a sanction either a default judgment on the issue of liability or an adverse inference instruction to the jury based on Defendants' spoliation of evidence

crucial to proving his excessive force claim. In their Response, Defendants argue that Lewis's Motion for Sanctions should be denied. *Doc. 105*.

I have now carefully reviewed AD 14-04. I do not find much in its contents that might "pose a security threat" if it were made known to prisoners, and even less that qualifies as "highly confidential" information. Administrative Directive 14-04 casts grave doubt on the truthfulness of Warden Watson's explanation of why the video of the June 9, 2016 incident was not preserved. It also is directly relevant to whether Defendants are guilty of spoliation of evidence.

The relevant provisions of AD 14-04 are set forth below:

CONFIDENTIAL

SUBJECT: Surveillance (Visual and/or Audio) Recordings

NUMBER: 14-04                                    SUPERCEDES: 12-17

APPLICABILITY: All staff responsible for the maintenance and disposal of records utilized by the Department of Correction

REFERENCE: AR 017 Critical Incident Review:       PAGE 1 OF 11
              AD – Records Retention

APPROVED: Original signed by Ray Hobbs EFFECTIVE DATE: 01/10/2014

I. POLICY:

It shall be the policy of the Department of Correction to maintain surveillance recordings that document reported serious incidents/grievances/and/or unusual occurrences of the agency and facility operations for a period of seven (7) years.

*******************

II. DEFINITIONS:

A. Serious incidents/unusual occurrences – shall mean, but is not limited to: escapes, riots, planned force movements, uprisings, work strikes, homicides or deaths other than by natural causes, hostage situations, natural disasters, chemical spills, fires, major property damage, physical abuse, serious injury to inmates or staff, criminal activity, and major breaches of security.

B. Grievance – A grievance procedure is an administrative means for the expression and resolution of inmate problems and complaints. The mechanism is designed to solve the problem at the lowest level, as immediately as feasible, and in a manner that is fair, reasonable and consistent with the Department of Correction's mission.
********************

III. PROCEDURES:

A. Surveillance Administration

Each facility/unit Warden shall assign a Surveillance Administrator. The Surveillance Administrator shall be responsible for the retrieval, surveillance monitoring compliance, system maintenance monitoring, retention, and disposal of surveillance recordings in accordance with the agency approved procedures.
Administration shall include but is not limited to:

- Supervising the download of recorded surveillance events and maintaining local file storage from camera surveillance and hand-held equipment;

- Local file storage to include a monthly electronic folder of all recorded facility/unit recordings and backups;

- System integrity insuring required records are retained, managed and disposed of.

******************
C. Storage of Recordings

*******************

3. All surveillance recordings of serious incidents/unusual occurrences, grievance or allegations of such, will be retained for seven (7) years or until all litigation is complete.

4. Retrieved recordings of serious incidents/unusual occurrences, grievances or allegations of such will be copied onto a Flash Drive/DVD in a folder identifying the type of incident, by month and year, and any available eOMIS tracking number. For example: Varner Unit 06-13; Varner Unit "Grievances 06-13 Grievance/VU13-0123.
*******************

5. Incidents will be copied using the following procedures:

a. Regular Incidents

Step 1 – Identify the area, date, beginning and ending time of incident using 005's or other documents.

Step 2 – Locate incident on DVS using established timelines.

Step 3 – Review the incident in its entirety to insure beginning and ending timeframes are correct.

*******************

Step 5 – If the entire incident is not within documented timeframes, the new adjusted times will be documented.

Step 6 – Add two hours prior to the beginning and two hours past the ending time of incident and transfer the video footage for each camera(s) from the DVS to a recordable computer.

*******************
b. Grievance Request

Step 1 – Identify the area, date, beginning and ending time of incident using Inmate Grievance and attempt to verify with 005-s or other documents.

Step 2 – Locate incident on DVS using established timelines.

Step 3 – If no incident is located go to Step 6. If incident is found continue with Step 4.

Step 4 – Review the incident in its entirety to insure beginning and ending timeframes are correct.

Step 5 – If the entire incident is not within documented timeframes the new adjusted times will be documented.

Step 6 – Add two hours prior to the beginning and two hours past the ending time of incident and transfer the digital footage for each camera(s) from the DVS to a recordable computer.

*******************

Step 9 – Label recording and send to Grievance Officer for review and storage.

*******************

F. Notification of Need for Recording Review

The Incident/Grievance Officer or designee shall bring to the Warden's attention or his/her designee any accusation of physical or sexual abuse or allegations involving policy violations when reference to a surveillance camera or other video system is made in the report. The Incident/Grievance Officer or designee will IMMEDIATELY download the corresponding surveillance recording of the identified area. This recording will be stored using the eOMIS generated tracking number in the requesting file.

After Lewis filed his July 10, 2016 Emergency Grievance, the VSM Surveillance Administrator and his subordinates unquestionably did *not* comply with the required steps to locate and preserve the video, as stated in AD 14-04 § III(C)(5)(b)(Steps 1, 3, 6, and 9). If they had done so, the video of the June 9, 2016 incident would have been located and preserved.[3]

I conclude that Lewis has made a sufficient showing to justify a spoliation hearing to determine if he is entitled to an adverse inference jury instruction on Defendants' actions that resulted in the destruction of the video of the alleged excessive force incident. I further conclude that Lewis has not made a sufficient showing to justify the Court entering a Default Judgment against Defendants. *See Comstock v. UPS Ground Freight, Inc.*, 775 F.3d 990, 992 (8th Cir. 2014) (sanction of default judgment is appropriate only when there is an order compelling discovery, a willful violation of that order, and prejudice to the other party); *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 936 (8th Cir. 2007) (default judgment is a drastic sanction and is not favored).

The spoliation hearing will take place before United States District Judge Billy Roy Wilson on **July 21, 2021 at 2:00 p.m.**, in the Richard Sheppard Arnold

---

[3] It is hard to envision a more comprehensive step-by-step process for locating and preserving videos of incidents that take place at ADC facilities. For example, in this case, even if the person who tried to locate and preserve the video of this incident saw nothing to preserve using the approximate time of "10:30 a.m.," she or he *was required* to preserve two hours of the video, before and after "10:30 a.m." so it could be later reviewed to make certain the incident did not take place before or after what might be an inaccurately recorded time of the incident.

United States Courthouse, Courtroom #4C, 500 West Capitol Avenue, Little Rock, Arkansas 72201. Lewis will appear and participate in the hearing via video conferencing.

In addition to the witnesses Defendants may call, the Court directs counsel for Defendants to have the following witnesses available to testify: (1) "Sgt. J. Jackson," who denied Lewis's informal resolution; (2) Warden Randall Watson, who denied grievance # VSM16-02012 on October 9, 2016 (*Doc. 56 at 4*);[4] (3) the "Chief Deputy/Deputy/Assistant Director" who denied Lewis's Step Three appeal; (4) the VSM Surveillance Administrator and all other employees who initially tried but failed to locate and preserve the video of the incident after Lewis submitted his June 10, 2016 Emergency Grievance; (5) all VSM employees who *may* have seen the video of the June 9 excessive force incident before it was destroyed; and (6) all VSM employees who are referred to in Warden Watson's decision dated October 9, 2016, as having gone back in October 2016, to locate the video and who checked the security logs, and determined that Lewis was escorted out of his cell "at 10:50 a.m., not 10:30 a.m.," and then reported that information back to the decision maker who signed the October 9, 2016 decision denying Lewis's grievance.

---

[4] If Defendants contend that it was not Warden Watson whose signature appears on the "Warden/Center Supervisor's Decision" dated October 9, 2016, counsel for Defendants is directed to have available as a witness the "Warden/Center Supervisor or Designee" whose signature does appear.

Lewis's Motion for Sanctions (*Doc. 100*) is held in abeyance until after the July 21, 2021 spoliation hearing.

SO ORDERED, this 9th day of July, 2021.

                                                           /s/ J. Thomas Ray
                                                   UNITED STATES MAGISTRATE JUDGE